# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) Case No. 1:17CR00020-002<br>) |
| v. | ) **OPINION AND ORDER**<br>) |
| SANSON P. RODRIGUEZ, | ) By: James P. Jones<br>) United States District Judge |
| Defendant. | ) |

*Zachary T. Lee*, Assistant United States Attorney, Abingdon, Virginia, for United States; *Stephen R. Wills*, Roanoke, Virginia, for Defendant.

In this drug trafficking case, the defendant has filed motions to suppress statements made by him to law enforcement officers, as well as evidence seized without a warrant but allegedly with his consent. In addition, the defendant seeks to disqualify the prosecutor. Following an evidentiary hearing, and based upon my factual findings and the applicable law, I will deny the motions.[1]

---

[1] Subsequent to the hearing on the present motions, the defendant entered a conditional guilty plea pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. I have not yet determined whether to accept or reject the Rule 11(c)(1)(C) Plea Agreement. If rejected, I must give the defendant the opportunity to withdraw his guilty plea and go to trial. *Id.* at 11(c)(5). For this reason, I will proceed to set forth the reasons for my denial of the motions.

I. MOTIONS TO SUPPRESS.

A. *Background.*

The defendant, Sanson P. Rodriguez, is charged by Indictment with conspiring to distribute or possess with the intent to distribute methamphetamine and knowingly using a communication device to cause the facilitation of a felony controlled substance offense, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and 843(d). He is also charged with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Rodriguez has filed three separate motions to suppress, involving his contacts with law enforcement officers on three different dates. The first occasion was on August 2, 2016, at which time he consented to a search of his home. The second was on December 21, 2016, when he was interrogated and consented to a search of his cell phone. The final occasion was on June 20, 2017, when Rodriguez was questioned at length while being driven to Virginia by a federal agent after his arrest in North Carolina on the present charges. The government contends that on all of these occasions Rodriguez voluntarily waived his constitutional rights.[2]

Rodriguez challenges the effectiveness of his waivers, based upon his lack of English and the effects of his methamphetamine drug use.

---

[2] While the motions to suppress also sought to exclude evidence from vehicle searches on August 2 and December 21, as well as a statement given by the defendant on August 2, the government has agreed that it would not attempt to introduce any such evidence at trial and thus those claims are moot.

In this case, law enforcement officers contend that they administered *Miranda* warnings to Rodriguez, although it is claimed on his behalf that he could not understand or appreciate their meanings. As the Fourth Circuit has stated in regard to similar claims:

> M*iranda* held that once given the now familiar warnings of his rights under the fifth and sixth amendments, a suspect could waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. The Supreme Court has reiterated that while requiring *Miranda* warnings does not, of course, dispense with the voluntariness inquiry, cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.
>
> As we have previously observed, our inquiry into whether an individual waived effectuation of the rights conveyed in the *Miranda* warnings has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, in addition to being voluntary, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. We determine whether a *Miranda* waiver is voluntary, knowing, and intelligent by examining the totality of the circumstances. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.
>
> The voluntariness of a waiver depends on the absence of police overreaching, not on free choice in any broader sense of the word. A defendant's incriminating statement is deemed involuntary only if induced by such duress or coercion that the suspect's will has been overborne and his capacity for self-determination critically impaired. To determine whether a defendant's will has been overborne or his capacity for self determination critically impaired, courts must consider the totality of the circumstances, including the characteristics

of the defendant, the setting of the interview, and the details of the interrogation. As relevant to this case, we have held that consumption of pain killers and narcotics are alone insufficient to render a waiver involuntary. Rather, the focus of the voluntariness determination remains whether one's will has been overborne. A deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary. Similarly, other circuits have held that intoxication does not automatically render a confession involuntary; rather, the test is whether this mental impairment caused the defendant's will to be overborne. The Government has the burden of proving, by a preponderance of the evidence, that the defendant's waiver of his *Miranda* rights was knowing and voluntary.

*United States v. Walker*, 607 F. App'x 247, 255-56 (4th Cir. 2015) (unpublished) (internal quotation marks, citations, and alterations omitted).

With respect to the searches of Rodriguez' property, it is established that a search conducted pursuant to a voluntary consent is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). There is "no talismanic definition of voluntariness" in determining the validity of the consent. *Id.* at 224 (internal quotation marks and citation omitted). The voluntariness of a consent to a warrantless search is a factual matter, based upon the totality of the circumstances, including the characteristics of the accused, as well as the conditions under which the consent to search was given. *United States v. Lattimore,* 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

While it may be relevant on the question of voluntariness, the consent need not be knowing and intelligent, that is, the subject need not be advised of his right

to refuse consent or be told of the consequences of such consent. *See United States v. Drayton*, 536 U.S. 194, 206-07 (2002). The fact that the defendant was not given *Miranda* warnings prior to consenting to a search does not require a finding that the consent was involuntary. *United States v. Patane*, 542 U.S. 630, 634 (2004). A defendant in custody may give a voluntary consent to search. *United States v. Watson*, 423 U.S. 411, 424 (1976).

### B. *Findings of Fact.*

The following are my findings of fact as to the motions to suppress. In determining the credibility of the witnesses at the evidentiary hearing, I have taken into account the rationality and internal consistency of the testimony, the extent of detail and coherent nature of the testimony, the manner of testifying by the witnesses, and the degree to which the testimony is consistent or inconsistent with other evidence in the case.

1. The defendant is Mexican-born, 56 years old, with two years of schooling. He has lived in the United States since 1986, most of that time in the Lexington, North Carolina, area. He has worked as a farmer laborer and more recently as an operator of heavy machinery in highway construction. He denies being a United States citizen although he claims to have a U.S. passport.

2. The defendant testified in Spanish during the hearing on the present motions. He contended (through an interpreter) that he understands "very little"

English and can speak English only "[a] little bit." Tr. 14.[3] I find, however, that while the defendant sometimes uses "broken English," Tr. 99, he does in fact speak and understand English. The audio recording of the incriminating interview by ATF Special Agent Duke on June 20, 2017, which lasted one and a half hours, clearly shows that the defendant has sufficient English language ability to have allowed him to understand and converse with the law enforcement officers involved in all of these incidents.[4] I find that the defendant has feigned an inability to speak and understand English in an effort to impede the prosecution. While uneducated, the defendant is mature and street-wise. The fact that he has intentionally misrepresented his language ability indicates his relative sophisticated understanding of the criminal justice system.

3. On August 2, 2016, Detective Jeremy Luffman of the Surry County, North Carolina, Sheriff's Office, having information that the defendant was a drug dealer and learning that he was at the Mount Airy, North Carolina, home of Amy Hoyt, a codefendant in the present case, went with five or six other officers to Hoyt's home and placed Rodriguez in custody. Luffman and Rodriguez talked at the scene, and Rodriguez was then taken to an interrogation room used by the Sheriff's Department. The room is approximately twelve feet square and

---

[3] References are to the transcript of the evidentiary hearing on the present motions, ECF No. 591.

[4] The audio recording was introduced as Government Exhibit 1, ECF No. 563.

windowless. Investigator Bradley Brown of the Sheriff's Department of Grayson County, Virginia, and a member of the Bristol, Virginia, ATF Violent Crime Task Force, talked to Rodriguez and asked him if he would consent to a search of his residence in Lexington, North Carolina. Rodriguez was cooperative and alert. He agreed to the search and after a brief conversation of about a half hour, signed a written police form entitled "Consent to Search" at about 3:00 p.m., witnessed by Brown and Lieutenant Matt Darisse of the Surry County narcotics unit. Before Rodriguez signed the form, Brown read it to Rodriguez, who was seated across from him in the interview room. After every few sentences read, Brown asked Rodriguez if he understood, and Rodriguez said that he did. The Consent to Search form stated as follows:

> I, <u>Sanson Penaloza Rodriguez</u> having been informed of my right not to have a search made of the premises or vehicle hereafter described without a search warrant and of my right to refuse to consent to such a search, hereby voluntarily authorize Deputies of the Surry County Sheriff's Office, to conduct a complete search of the premises or vehicle under my control described as <u>308 Leonford St. Lexington, NC</u>.

Def.'s Ex. 2, ECF No. 563-2.

Rodriguez gave Brown the directions to his home and gave him the key to the house for the officers to use. Officers subsequently searched the home and seized incriminating items. While in his testimony Rodriguez denied that he signed the consent form, Tr. 16, and claimed that he had actually refused

permission to search his home when asked, Tr. 18, I do not believe him, and I instead credit Investigator Brown's testimony that Rodriguez voluntarily consented to the search of his residence. Rodriguez' signature on the consent form is similar to that contained on an Agreement Concerning Use of Statements, executed in connection with a proffer session with the federal prosecutor and also signed by Rodriguez' former attorney. Gov't's Ex. 3, ECF No. 563-5. Moreover, none of the officers involved spoke Spanish, and Rodriguez' claim that he denied them permission to search his house is inconsistent with his claim that he did not understand the officers.[5] While Rodriguez was in custody in an interrogation room

---

[5] Asked by the court about this inconsistency, Rodriguez replied, "I speak a little bit of English." Tr. 26. Later in his testimony, however, he reverted to similar inconsistencies about his language ability. For example, he testified as follows:

> Q   They asked you if you had any guns in your house?
>
> A   *Yes*.
>
> Q   And did you tell them if you did or not?
>
> A   No. I had a BB gun.
>
> Q   Did you tell them that?
>
> A   *Yes*.
>
> . . . .
>
> Q    How long did *you talk to them*?
>
> A    We were standing there like 20 minutes, 20, 25 minutes.
>
> Q    At the office that you were taken to?

when he gave consent, I find that he was not mistreated (he does not claim that he was), he understood the advice given to him concerning the requested search, and he voluntarily consented to it.

4. The next occasion was on December 21, 2016, when Rodriguez was placed in custody between 12:30 and 1:00 p.m., following a traffic stop, and taken to the same office in Mount Airy by Detective Luffman. At first, there was one other officer present from Surry County, but later Investigator Brown and ATF Special Agent Jonathan Tabor arrived. Only Luffman and Brown questioned Rodriguez.

Rodriguez was read his *Miranda* rights by Luffman and signed an Advice of Rights Waiver Form at about 2:00 p.m. Gov't Ex. 2, ECF No. 563-4. Rodriguez requested that the form be in the name of a fictitious person, Juan Torres, and he signed it as such, explaining to the officer that he didn't want his real name on the document because "he didn't want people to know that he was taking to law enforcement." Tr. 59. Luffman understood the concern and since he felt it didn't matter, went along with the subterfuge. Rodriguez testified that he did not

---

    A    *We talked* for about a half an hour because they wanted me to — they were asking me questions. *But I didn't know anything. I don't know English*.

Tr. 35 (emphasis added).

remember being advised of his *Miranda* rights. According to Luffman, after Rodriguez signed the form, he was interviewed "for a pretty good while." Tr. 64.

5. Rodriguez also signed a Consent to Search Form on that same day, about two hours later, consenting to a search of his cell phone, this time in his own name. Def.'s Ex. 3, ECF No. 563-3.[6] Rodriguez admits that he signed the consent form, but he claims that it was not explained to him, and he thought it was a paper "to let me go back home." Tr. 23. I find, based on Brown's testimony, that the consent form was read to him, and Rodriguez was asked by Brown if he understood, and he said that he did.

6. Rodriguez contends that he was under the influence of methamphetamine during this period and had been awake, "like four days," at the time. Tr. 24. Luffman testified that Rodriguez appeared "normal" and appeared to understand what was said to him. Tr. 62. Agent Tabor testified that he appeared "tired" later in the interview and was "nodding off" on several occasions. Tr. 112, 117.

7. During the interrogation of Rodriguez by Brown, he gave "fairly detailed information" about his involvement in drug trafficking. Tr. 93-95. Rodriguez did have difficulty in staying awake at one point, but recovered and said

---

[6] The form was in the same format as the August 2 form, except that the "premises or vehicle" was described as "ZTE cell phone Ondigo black plastic case." *Id.* The form was witnessed by Investigator Brown and Detective Luffman.

he was "okay." Tr. 96, 97, 108. Brown's interrogation of Rodriguez lasted approximately one hour and Rodriguez' nodding off was "more than halfway in the interview." Tr. 108.

8. Based upon all of the circumstances, and crediting the law enforcement officers' testimony, I find that Rodriguez was advised of his *Miranda* rights, understood them, and voluntarily, knowingly, and intelligently waived his right to remain silent on this occasion. I further find that his consent to search his cell phone was voluntary. Rodriguez had the ability to understand and communicate with the officers, and while there was evidence that he was not alert at times during the interview, I find that this condition did not interfere with his ability to make the waivers in question. I further find that while Rodriguez may have been held in custody for a number of hours, the length of the interrogation was not coercive and his waivers were not affected.[7]

---

[7] The record does not indicate the total length of time that Rodriguez was interrogated on December 21. He contends that he was in custody from 10:00 a.m. until 8:00 p.m., Tr. 21, but he does not contend that he was interrogated that whole period of time. In fact, he claims that once taken to the interrogation room, "I sat down in a chair and I fell asleep." Tr. 24. But he also admitted that he was questioned by at least one agent. Tr. 22. I find on the admittedly incomplete evidence that while Rodriguez was questioned for several hours, it was not the entire length of time he was held in custody. He was arrested between 12:30 p.m. and 1:00 p.m., and was first questioned by Detective Luffman, who obtained the *Miranda* waiver at approximately 2:00 p.m., and then later by Investigator Brown, who obtained the consent to search the cell phone at 4:00 p.m. It was estimated by Brown and by ATF Special Agent Tabor, who was present during the questioning, that the interrogation by Brown lasted up to one hour. Tr. 108, 113. Brown then left. There is no evidence of further questioning by any officers.

9. The final occasion was on July 20, 2017. Rodriguez was arrested on the present charges on that day at his home in Lexington, North Carolina, and AFT Special Agent Duke alone transported him by car to Galax, Virginia, where a command post had been set up for the multiple arrests in this case. Agent Duke recorded the trip and his entire conversation with Rodriguez. Based on the recording of that conversation, it is clear that Rodriguez was fully advised of his *Miranda* rights and validly waived them.

## II. MOTION TO DISQUALIFY.

The defendant has also filed a motion seeking to disqualify the Assistant United States Attorney ("AUSA") assigned to this case. The grounds for the motion relate to the defendant's prior motion to enforce a plea agreement signed by the parties, but ruled by the court to be unenforceable due to mutual mistake as to a material term of the agreement. *United States v. Rodriguez*, No. 1:17CR00020-002, 2017 WL 5992385 (W.D. Va. Dec. 4, 2017). The defendant contends that because the AUSA testified at the hearing on the motion, he is disqualified under the "witness-advocate" rule. It is also argued that because the AUSA opposed the defendant's motion and testified, that "calls into question his partiality and bias toward Mr. Rodriguez and whether he and his office can pursue their duty to seek the appropriate justice in his case." Def.'s Mot. Disqualify 6, ECF No. 485. I do not agree.

In the first place, there were no disputes of fact as to the circumstances under which the prior Plea Agreement was signed. The AUSA, as well as Rodriguez' prior attorney, testified only to establish those uncontested facts. The sole issue before the court was the legal effect of those facts. Under those circumstances, the "witness-advocate" rule does not apply and there is no impropriety by the AUSA's continued representation in this case. *See* Va. Rules of Professional Conduct 3.7(a)(1). There certainly has been no showing that the AUSA has in fact acted with less than professional and even-handed treatment of Rodriguez and his case.

### III. CONCLUSION.

For these reasons, it is **ORDERED** that the defendant's motions to suppress, ECF Nos. 474, 475, 476, and Defendant's Motion to Disqualify, ECF No. 485, are DENIED.

ENTER: June 5, 2018

/s/ James P. Jones
United States District Judge